THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEONARD DIXON, Defendant-Appellant.
First District (3rd Division)    No. 76-673

Opinion filed March 22, 1978.

Becker & Tenenbaum, of Chicago (Theodore M. Becker, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

The defendant, Leonard Dixon, was charged with the murder of Jimmy Hudson. After a jury trial, he was found guilty of voluntary manslaughter and sentenced to a prison term of 2 to 6 years. On appeal, he contends the trial court erred: (1) in giving the jury voluntary manslaughter instructions where the record contained no basis to support such a conviction; (2) in allowing the gun which the defendant used in shooting Hudson into the jury room during the jurors' deliberations; and (3) in instructing the jury that exculpatory statements by the defendant were admissions. We find no merit in these arguments, and affirm the defendant's conviction.

Ruth Tucker, an eyewitness to the shooting, testified for the State that she knew both the defendant and the victim, Jimmy Hudson. She stated that as she and Hudson approached Hudson's girlfriend's apartment in the early evening to bring a baby bottle for Hudson's son, she saw the defendant standing on the porch. Hudson told the defendant he wanted to speak with him and began advancing toward him. The defendant responded by telling Hudson they had nothing to discuss, and by backing away from him. Hudson continued moving toward the defendant, saying he wanted to speak with him, and the defendant finally backed away toward the apartment. At this point, the defendant said, "You don't have anything to talk to me about," pulled out the gun, shot Hudson, and ran into the apartment. Miss Tucker testified that she then called the police, and later removed a baby bottle from the victim's pocket in the presence of the police and onlookers.

The State also presented the doctor who performed an autopsy on the victim. The doctor testified he found three entry bullet wounds in Hudson's body trunk, and two entry wounds in his arms, and that he recovered three bullets from Hudson's body. Also introduced as evidence was the stipulated testimony of a ballistics expert that the three bullets removed from the victim were fired by the automatic pistol recovered from the defendant.

The defendant did not testify on his own behalf at trial, but the State introduced as evidence a formal written statement, transcribed by a court reporter, which the defendant made the morning following the shooting. In that statement, read into evidence by an assistant State's Attorney, the defendant said Hudson came to the door of his girl friend's apartment. The defendant said he told Hudson to leave him alone, but that Hudson told him they were going to "get it on" and that he had "something to settle" with the defendant. The defendant told Hudson he had nothing to discuss and wanted to be left alone, but Hudson moved his hands toward his pocket and approached the door. After telling Hudson to leave him alone and to get away from the door, the defendant shot Hudson. The defendant then went to his father's home, and eventually turned himself in to the police.

The defendant explained his action by saying in his statement that after Hudson said, "he was going to get it on," he became afraid, ran into the bedroom to get a gun, and, uncertain whether Hudson had a gun, shot him. The defendant also stated that he previously had heard Hudson was "running the projects" and had been "in trouble," and that he had been locked up "for beating his wife or something." The defendant said that Hudson also had beaten his sister and been taken away by the police. Accordingly, the defendant's statement was that he was afraid because he did not know what Hudson might do.

The defendant's statement also indicated that, before the shooting, Hudson had insulted Hudson's girl friend and shouted at the baby; that Hudson had told his girl friend's brother that he did not want the defendant to hold his baby, and that he was going to throw the defendant out, and that Hudson had told his girl friend he had bought a gun. In the statement, however, the defendant acknowledged that he never had been threatened by Hudson, never had any physical contact with Hudson, and never saw Hudson with a gun.

Belinda Spraggins, a resident of the apartment building where Hudson was killed, was called as a witness by the defendant. She testified that she heard four shots while she was typing in her kitchen on the evening in question, and that within seconds after the shots were fired she saw Hudson backing out of the apartment, but saw no one else in the corridor.

She also testified that she saw Ruth Tucker coming out of her house as the defendant was walking down the corridor, and that she did not see a baby bottle anywhere.

Over the defendant's objections, the trial judge instructed the jury that if the evidence showed beyond a reasonable doubt the defendant unreasonably believed circumstances existed which would have justified his intentional or knowing killing of the victim, he was guilty of voluntary manslaughter. The trial judge also instructed the jury that the defendant "made an admission of a fact or facts relating to the crime charged in the indictment." And, over the defendant's objection, the trial judge permitted the jury to take the homicide weapon into the jury room during its deliberations.

■■ The defendant first argues that there was no evidence to support the judge's instructions, and the jury's verdict, on voluntary manslaughter. There was sufficient evidence, however, for the jury to conclude that the defendant shot the victim because he believed circumstances existed which would have justified his intentional or knowing killing of Hudson, but that his belief was unreasonable. This evidence in turn justified a jury instruction on and verdict of voluntary manslaughter.

That the jury was justified in concluding the defendant believed such circumstances existed is evidenced by the statement he made the morning after the shooting, when he revealed that he did not know whether Hudson was carrying a gun, and that he feared what Hudson might do because of his threats and the defendant's perception of him as a troublemaker. And the jury also had a sound basis for finding that this belief was unreasonable because the defendant never had been threatened by Hudson before the incident, never had any physical contact with Hudson, and did not see Hudson with a gun at any time, including the time of the shooting. Consequently, the trial judge was justified in giving voluntary manslaughter instructions, and the jury's subsequent verdict was well grounded in the facts and law.

In a related argument, the defendant claims the jury could have found him either guilty of murder if it believed Ruth Tucker's testimony, or not guilty by reason of self-defense if it believed the defendant, but it could not have found him guilty of voluntary manslaughter. He contends that giving such instructions relieved the jurors of the need to make this decision by presenting them with an easier compromise verdict. This argument is not persuasive. The jury was free to believe or disbelieve any or all of the testimony of the defendant and Ruth Tucker, and to resolve the inconsistencies between their accounts of the shooting. *People v. Warren* (1965), 33 Ill. 2d 168, 174, 210 N.E.2d 507; *People v. Pickett* (1976), 35 Ill. App. 3d 909, 913, 342 N.E.2d 766.

The possibility always exists that a jury will as a compromise return a

voluntary manslaughter verdict in trying a murder charge. (*People v. Thomas* (1978), 58 Ill. App. 3d 402, 374 N.E.2d 743; *People v. Redman* (1971), 133 Ill. App. 2d 581, 584, 273 N.E.2d 639.) But the evidence here warrants the conclusion that the jury correctly found the defendant guilty of voluntary manslaughter, rather than that it picked this verdict as an easy way out of a dilemma. For, even if the jurors believed the defendant's story, and rejected Ruth Tucker's version, a voluntary manslaughter finding would have been justified if the jurors felt the defendant's belief he needed to use deadly force to protect himself was unreasonable under the circumstances. And, certainly, if the jurors believed Ruth Tucker, and disbelieved the defendant, or else believed both stories, they could have concluded that the defendant intentionally or knowingly killed the victim, whether whether or not he believed he was acting in self-defense, because his belief that his actions were justified was unreasonable. Thus, there was more than enough evidence to support the jury verdict that the defendant shot Hudson for reasons other than legitimate self-defense, and in fact killed him because of an unreasonable and unjustified belief that the victim might shoot or otherwise harm him.

■■ The defendant contends that the trial court erred in allowing the homicide weapon into the jury room. A trial judge is vested with considerable discretion in deciding what exhibits may be sent to the jury room. (*Lamphere v. Old Second National Bank* (1976), 39 Ill. App. 3d 610, 614, 350 N.E.2d 272; *Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 160, 349 N.E.2d 578.) The court may permit the jurors to take with them writings and tangible objects which have been duly admitted into evidence. (*Wilkinson v. Mullen* (1975), 27 Ill. App. 3d 804, 808, 327 N.E.2d 433.) The defendant cites *People v. Kirkpatrick* (1953), 413 Ill. 595, 110 N.E.2d 519, where the court held that admitting a stolen meat grinder into the jury room was error, to support his position. Yet, in *Kirkpatrick* the supreme court held only that the judge's action was error, and expressly stated it was reversing because of the numerous errors committed by the trial court of which sending the meat grinder to the jury room was only one. In the absence of any showing of prejudice or abuse of discretion by the trial judge, the defendant's contention that it was an abuse of discretion to allow the gun to be taken into the jury room must be rejected. *People v. Allen* (1959), 17 Ill. 2d 55, 62-63, 160 N.E.2d 818; *People v. Mirmelli* (1970), 130 Ill. App. 2d 1, 15, 264 N.E.2d 470, *rev'd on other grounds* (1973), 54 Ill. 2d 28, 294 N.E.2d 257.

■■ The defendant's final argument, that the court erred in instructing the jury that in the defendant's written statements read into evidence, he "made an admission of a fact or facts relating to the crime charged in the indictment," also is unconvincing. Here, the defendant admitted shooting the victim. He admitted that he did not know if the victim had a gun

when he shot him. And he admitted that, prior to the incident, he never saw the victim with a gun, or had any physical contact with him, or even was threatened by him. These facts, together with the testimony of the State's witnesses, could have led to an inference of the defendant's guilt of the crime of murder—though they would not inevitably lead to such a conclusion. An admission is a statement by an accused of facts which, when taken in conjunction with other facts, may, but will not necessarily, lead to an inference of guilt of the crime charged. (*People v. Stanton* (1959), 16 Ill. 2d 459, 466, 158 N.E.2d 47; *People v. Clark* (1975), 32 Ill. App. 3d 926, 931, 337 N.E.2d 291.) Thus, the defendant's statement was, by legal definition, an admission, rather than an exculpatory statement.

Judgment affirmed.

JIGANTI, P. J., and McGILLICUDDY, J., concur.